IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

KIM HILL,                              )
                                       )
                 Plaintiff,            )
                                       )
        v.                             )       1:19CV852
                                       )
ANDREW SAUL,                           )
Commissioner of Social Security,       )
                                       )
                 Defendant.            )

MEMORANDUM OPINION AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Plaintiff Kim Hill ("Plaintiff") brought this action pursuant to Section 205(g) of the Social Security Act (the "Act"), as amended (42 U.S.C. § 405(g)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") under Title II of the Act. The parties have filed cross-motions for judgment, and the administrative record has been certified to the Court for review.

I.      PROCEDURAL HISTORY

Plaintiff protectively filed her application for DIB on August 21, 2014, alleging a disability onset date of August 1, 2014. (Tr. at 19, 175-81.)[1] She later amended her alleged onset date to November 10, 2015. (Tr. at 19, 243.) Her claim was denied initially (Tr. at 78-89, 107-10), and that determination was upheld on reconsideration (Tr. at 90-106, 115-22). Thereafter, Plaintiff requested an administrative hearing de novo before an Administrative

---

[1] Transcript citations refer to the Administrative Record [Doc. #9].

Law Judge ("ALJ"). (Tr. at 123-24.) Plaintiff attended the subsequent hearing on July 12, 2017, along with her attorney and an impartial vocational expert. (Tr. at 19.) Following the hearing, ALJ concluded that Plaintiff was not disabled within the meaning of the Act. (Tr. at 34), and, on January 2, 2019, the Appeals Council denied Plaintiff's request for review, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 6-13).

II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, the scope of review of such a decision is "extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance Program (SSDI), established by Title II of the Act as amended, 42 U.S.C. § 401 et seq., provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program (SSI), established by Title XVI of the Act as amended, 42 U.S.C. § 1381 et seq., provides benefits to indigent disabled persons. The statutory definitions and the regulations promulgated by the Secretary for determining disability, see 20 C.F.R. pt. 404 (SSDI); 20 C.F.R. pt. 416 (SSI), governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1.

of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at the first two steps, and if the claimant's impairment meets or equals a "listed impairment" at step three, "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment," then "the ALJ must assess the claimant's residual functional capacity ('RFC')." Id. at 179.[3] Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the [Government] to prove that

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

a significant number of jobs exist which the claimant could perform, despite the claimant's impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

III. DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" since her amended alleged onset date, November 10, 2015. Plaintiff therefore met her burden at step one of the sequential evaluation process. (Tr. at 21.) At step two, the ALJ further determined that Plaintiff suffered from the following severe impairments:

Degenerative disc disease, bipolar disorder, anxiety, and depression[.]

(Tr. at 21.) The ALJ next found at step three that none of Plaintiff's impairments, individually or in combination, met or equaled a disability listing. (Tr. at 22-24.) Therefore, the ALJ assessed Plaintiff's RFC and determined that, through her date last insured, Plaintiff had the RFC to perform:

> [M]edium work as defined in 20 CFR 404.1567(c). [Plaintiff] is capable of: occasionally lifting fifty pounds; frequently lifting twenty-five pounds; standing or walking six hours of an eight hour work day; and sitting six hours of an eight hour workday. She is limited to frequent stooping. [She] retains the capacity for concentrating, persisting, or pace for one to three step instructions for two hour periods over an eight hour workday, 40 hours per week. [She] retains the capacity for social interaction for routine interaction with coworkers and supervisors. [Plaintiff] retains adaptive capacity to deal with routine changes and safety issues.

5

(Tr. at 24.) Based on this determination and the testimony of a vocational expert, the ALJ determined at step four of the analysis that Plaintiff was unable to perform any of her past relevant work. (Tr. at 33.) However, at step five, the ALJ found that, given Plaintiff's age, education, work experience, and RFC, she could perform other jobs available in the national economy. (Tr. at 33-34.) Therefore, the ALJ concluded that Plaintiff was not disabled under the Act. (Tr. at 34.)

Plaintiff now contends that substantial evidence fails to support the ALJ's finding that Plaintiff could perform medium work. In particular, Plaintiff challenges the ALJ's reliance on medical opinions issued prior to Plaintiff's amended onset date, and therefore prior to her 2016 spinal surgery. After a thorough review of the record, the Court agrees that the ALJ's decision fails to adequately address Plaintiff's worsening neck and back conditions from 2015 forward or the impact of those conditions on her RFC.

By all accounts, Plaintiff suffers from degenerative disc disease and underwent a previous cervical spine surgery, a C6-C7 foraminotomy, in 2008. (Tr. at 385.) Although she initially alleged only mental impairments in her DIB application in August 2014, Plaintiff added allegations of physical impairments in November 2014, including increasing back and neck pain, beginning after her initial application date. (Tr. at 19, 213.) This is also reflected in a treatment record in December 2014 from the office of her primary care physician, Dr. Scott McCune, reflecting that she had complained of a flare in her back pain. (Tr. at 488.) Plaintiff was seen by a consultative examiner, Dr. Hillman, on August 15, 2015 (Tr. at 317-19), and her records were evaluated by state agency physician Dr. E. Woods in September 2015 (Tr. at 95-100.)

6

Notably, the medical records reflect that soon thereafter, in late 2015, Plaintiff reported increasing back and neck pain and related symptoms. On September 1, 2015, Plaintiff was seen by her primary care physician, Dr. McCune, for back pain as well as brachioradial pruritus, a condition often associated with nerve entrapment due to degenerative disc disease,[4] with distribution on her shoulders and arms. (Tr. at 496.) Plaintiff described the latter as feeling like pins and needles in her arms. She was referred to a neurosurgeon, and two months later, on November 10, 2015, Plaintiff had her first appointment at Carolina Neurosurgery & Spine. (Tr. at 385-89.) Plaintiff later amended her application to reflect that day, November 10, 2015, as her disability onset date. The medical record from that appointment reflects that Plaintiff's neck and back pain had intensified, and her brachioradial pruritus had still not resolved, with a "pins and needle sensation in both arms with a feeling of weakness and severe itching." (Tr. at 385.) Updated x-rays of Plaintiff's cervical spine showed "degenerative changes including facet arthropathy," causing "chronic, progressive neck pain with bilateral arm pain and dysesthesias." (Tr. at 388.) The treatment record also reflects decreased sensation in a "stocking hand" formation, consistent with other objective findings of nerve compromise. (Tr. at 388.) The record indicates that Plaintiff used cold, heat, and a TENS unit for pain relief during this time, but experienced little relief. (Tr. at 385.) A cervical MRI was ordered, and reflected mild disc bulging at C4-5 and C5-6. In addition, at C6-7 "[t]here is decreased disc height with mild to moderate disc bulging. Associated marginal spurring is

---

[4] "Brachioradial Pruritus," Robbins, B.A., and Schmeider, G.J. (Apr. 23, 2020) (available at https://www.ncbi.nlm.nih.gov/books/NBK459321) ("[C]urrent theories suggest that brachioradial pruritus is a bifactorial process involving cervical nerve irritation and ultraviolet radiation (UVR) of the affected area. . . . DJD has been reported as the most common cervical spine abnormality in patients with brachioradial pruritus. Many authors suggest that cervical spine disease between C5 to C8 is causative.").

present. Mild central canal stenosis is noted. Mild right neural foraminal stenosis and moderate left neural foraminal stenosis is noted." (Tr. at 400, 381, 345.)

Plaintiff returned to see Dr. McCune a few weeks later, on January 13, 2016, and reported continuing numbness. (Tr. at 515.) Dr. McCune noted that she was seeing a neurosurgeon. (Tr. at 516.) Two weeks later, she returned to Carolina Neurosurgery & Spine and saw her neurosurgeon, Dr Deshmukh (Tr. at 376, 381-83.) Her pain was 10/10, and Dr. Deshmukh noted that "[s]he has failed medical management but with her history of complications with surgical intervention, we will attempt to maximize her conservative treatments." (Tr. at 382-83.) The records for that visit were also sent to Dr. McCune and made part of his records. (Tr. at 533-40.)

A myelogram was ordered and revealed as follows on February 25, 2016: moderate degenerative disc disease and mild to moderate facet arthropathy at C3-C4 and C4-C5; "[m]oderate DDD with broad-based disc bulge which minimally efaces the ventral canal" and "[u]ncinate spurring and facet arthropathy caus[ing] mild bilateral foraminal stenosis" at C5-C6; and "[m]oderately severe DDD [at C6-C7] with broad-based disc spur complex and thickening of the ligamentum flavum causing mild spinal canal stenosis. Uncinate spurring and facet arthropathy cause moderate left foraminal stenosis and mild right foraminal stenosis." (Tr. at 328, 406-07.) The myelogram also reflects that "[m]ild ventral impressions are present on the thecal sac at C4-C5, C5-C6, and C6-C7" and "incomplete filling/partial truncation left C6-C7 nerve root sleeve." (Tr. at 330, 406.) Dr. Deshmukh reviewed the myelogram, and a March 1, 2016 note reflects that "[m]yelogram shows spondylosis and stenosis at C5 C6 and C6 C7, worse at C6 C7. There is a listhesis at C4 C5. [Plaintiff] has

8

undergone a prior C6 C7 foraminotomy. The patient's symptoms [are] neck and arm pain." (Tr. at 374.) Dr. Deshmukh recommended that Plaintiff follow up to discuss possible fusion (ACDF) surgery. (Id.) Plaintiff saw Dr. Deshmukh on March 3, 2016, and the treatment note reflects that she would "likely benefit from C4-7 ACDF." (Tr. at 372.) Plaintiff also followed up with Dr. McCune in March 2016, and his treatment records were updated to include a diagnosis of Degenerative Disc Disease. (Tr. at 559-60.) Dr. McCune noted that Plaintiff's "pain related to her degenerative disc disease and cervical spinal stenosis" could be a factor in her high blood pressure. (Tr. at 559.)

Plaintiff saw Dr. Deshmukh again on June 23, 2016, and the records reflect that Plaintiff had both neck pain and low back pain. Dr. Deshmukh's assessment reflects that:

> The patient is neurologically stable but, clinically persistent with low back, right lower extremity, neck, and bilateral upper extremity pain. She has elected to focus on her neck at this time. We discussed the risks and benefits associated with the possible nonsurgical, conservative and surgical treatment options. I recommend surgical consideration at this time, specifically a C4-7 ACDF. I have addressed the patient's questions and concerns to her satisfaction. At this juncture, the patient feels her symptoms are intolerable and would like to proceed with the recommended surgery. We will also obtain lumbar MRI imaging to further evaluate her spinal anatomy.

(Tr. at 364.) Those records were also provided to Dr. McCune. (Tr. at 607-15.) The lumbar MRI was obtained on June 28, 2016, and reflected increasing degenerative lumbar spondylosis including disc bulging at multiple levels and a small lateral herniation as L5-S1. (Tr. at 324, 420-21.)[5]

---

[5] As the ALJ correctly notes, Plaintiff was instructed to manage this condition with physical therapy and pain medication. (Tr. at 26, 353.) This conservative approach was, in part, due to Plaintiff's documented decision to address her cervical spine issues first, as the symptoms, including pain, were more severe in her neck. (Tr. at 26, 364.) In addition, Plaintiff's neurosurgeon noted that the plan to "maximize [Plaintiff's] conservative treatments," even regarding her cervical spine symptoms, stemmed from Plaintiff's "history of complications

9

Accordingly, at her surgeon's recommendation, Plaintiff underwent an anterior cervical discectomy and fusion (ACDF) of C4 through C7 on July 6, 2016. (Tr. at 402-03.) By all accounts, Plaintiff's neck pain improved after her surgery and recovery, although she reported to her psychiatrist that the neck surgery had "not helped her neck pain as much as she had hoped." (Tr. at 466.) In a follow up appointment with Dr. Deshmukh's office in August 2016, she continued to report episodes of "throbbing" pain in her bilateral upper extremities, but noted that the pain was intermittent, rather than continuous as it had been prior to the fusion procedure. (Tr. at 348, 353.) At the time of the visit, her pain was 3/10, but she reported that "[a]ny movements of her head tend to increase her symptoms." (Tr. at 348.) Similarly, in a visit with Dr. Deshmukh in December 2016, she reported "continued neck pain and muscular pain in her left scapular area" with "aching, throbbing" pain currently at 5/10. (Tr. at 337, 342.) She was continued on a regimen of non-surgical pain management. (Tr. at 342.) These treatment records were also provided to Dr. McCune, Plaintiff's primary care physician. (Tr. at 700-06, 751-58). At a subsequent examination on June 28, 2017, Dr. McCune completed a Medical Source Statement, reflecting that Plaintiff could lift no more than 5 pounds frequently and 10 pounds occasionally.[6] (Tr. at 27, 782-83.) He also opined that due to symptom interference she would likely be off-task greater than 15% of the work

---

with surgical intervention." (Tr. at 382-83.) In other words, Plaintiff's July 2016 spinal surgery is documented as a last resort on the part of her spine specialists to reduce symptoms that were otherwise intractable.

[6] This is consistent with Plaintiff's testimony that she was unable to lift her 13-pound dogs, and that lifting them would be "very, very painful." (Tr. at 65, 25.)

10

day, and that she was not capable of performing medium level work involving lifting up to 50 pounds and frequent lifting of up to 25 pounds. (Tr. at 782-83.)[7]

The ALJ gave Dr. McCune's opinion little weight, and instead cited Plantiff's post-surgical improvement as evidence that, from November 2015 forward, Plaintiff could perform the medium level work opined by Dr. Woods in September 2015, prior to both Plaintiff's amended alleged onset date and the extensive history of neurosurgical treatment outlined above. The ALJ does acknowledge that Plaintiff underwent neck surgery after Dr. Woods rendered his findings. However, the ALJ disregards the impact of this surgery and the underlying impairment on Plaintiff's RFC, noting Plaintiff's improvement upon recovery, full strength, and correct hardware placement. (Tr. at 27.) As set out above, Plaintiff presented copious, objective evidence of worsening degenerative disc disease in both her lumbar and cervical spines during the relevant time period. The ALJ rejected Plaintiff's allegations of pain from these impairments based on the opinions of Drs. Woods and Hillman, whose findings pre-date the objective evidence of Plaintiff's deteriorating condition. Although both the ALJ and the Commissioner assert that Plaintiff's post-surgical improvement supports Plaintiff's ability to perform the same level of work opined by Drs. Woods and Hillman in August and September 2015, no medical professional has considered the impact of Plaintiff's deterioration, subsequent surgery, or recovery on her RFC other than Dr. McCune, whose opinion was summarily dismissed.

---

[7] Plaintiff notes that if she were limited to light or sedentary work, a finding of "disabled" would be directed by the applicable Medical-Vocational Guidelines. (Pl. Br. at 14-15.)

Notably, for claims like Plaintiff's that are filed before March 24, 2017, ALJs evaluate the medical opinion evidence in accordance with 20 C.F.R. § 404.1527(c). Brown v. Comm'r Soc. Sec., 873 F.3d 251, 255 (4th Cir. 2017). "Medical opinions" are "statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." Id. (citing 20 C.F.R. § 404.1527(a)(1)). While the regulations mandate that the ALJ evaluate each medical opinion presented to her, generally "more weight is given 'to the medical opinion of a source who has examined you than to the medical opinion of a medical source who has not examined you.'" Brown, 873 F.3d at 255 (quoting 20 C.F.R. § 404.1527(c)(1)). And, under what is commonly referred to as the "treating physician rule," the ALJ generally accords the greatest weight—controlling weight—to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to

> provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" or is "inconsistent with other substantial evidence in [the] case record," it is not entitled to controlling weight. 20 C.F.R. § 404.1527(c)(2); see also Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4; Brown, 873 F.3d at 256; Craig, 76 F.3d at 590; Mastro, 270 F.3d at 178.[8] Instead, the opinion

---

[8] For claims filed after March 27, 2017, the regulations have been amended and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded. The new regulations provide that the Social

Case 1:19-cv-00852-TDS-JEP   Document 17   Filed 02/19/21   Page 12 of 15

must be evaluated and weighed using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

The Fourth Circuit has recently confirmed the application of the treating physician rule in <u>Arakas v. Commissioner</u>, 983 F.3d 83 (4th Cir. 2020) and <u>Dowling v. Commissioner</u>, 986 F.3d 377 (4th Cir. 2021). In <u>Arakas</u>, the Fourth Circuit "emphasized that the treating physician rule is a robust one: '[T]he opinion of a claimant's treating physician [must] be given great weight and may be disregarded only if there is persuasive contradictory evidence.'" <u>Arakas</u>, 983 F.3d at 107 (quoting <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987)). Thus, "the opinion *must* be given controlling weight *unless* it is based on medically unacceptable clinical or laboratory diagnostic techniques or is *contradicted* by the other substantial evidence in the record." <u>Id.</u> (emphasis in original). Similarly, in <u>Dowling</u>, the Fourth Circuit emphasized that even if a "medical opinion was not entitled to controlling weight, it does not follow that the ALJ had free reign to attach whatever weight to that opinion that he deemed fit. The ALJ was required to consider each of the six 20 C.F.R. § 404.1527(c) factors before casting [treating physician] opinion aside." <u>Dowling</u>, 986 F.3d at 385. "While an ALJ is not required to set forth a detailed factor-by-factor analysis in order to discount a medical opinion from a treating

---

Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. However, the claim in the present case was filed before March 27, 2017, and the Court has therefore analyzed Plaintiff's claims pursuant to the treating physician rule set out above.

13

physician, it must nonetheless be apparent from the ALJ's decision that he meaningfully considered each of the factors before deciding how much weight to give the opinion." Id.

Here, the ALJ rejected the opinion of Plaintiff's treating physician, Dr. McCune, which was the only medical opinion regarding Plaintiff's physical impairments that covered any of the period from the November 1, 2015 alleged onset date to the date of the decision.[9] In doing so, the ALJ gave significant weight to the consultative examination by Dr. Hillman and the evaluation by state agency physician Dr. Woods. (Tr. at 27.) However, the opinions from Dr. Hillman and Dr. Woods pre-date the alleged onset date, and the record contains hundreds of pages of treatment and surgical notes, along with objective testing such as MRIs, myelograms, and x-rays, whose bearing on Plaintiff's work capacity has been considered by the ALJ alone. See Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017) (citing 20 C.F.R. §§ 404.1529, 416.929 and remanding where the lack of medical support for the ALJ's conclusions "amount[ed] to the ALJ improperly 'playing doctor.'"); see also Arakas, 983 F.3d at 108 ("[T]he ALJ improperly substituted hi own opinion for Dr. Harper's. An ALJ may not substitute his own lay opinion for a medical expert's when evaluating the significance of clinical findings."); Kee v. Berryhill, 1:15CV1039, 2017 WL 788306 at *6 and n.7 (M.D.N.C. Mar. 1, 2017) (remanding where Plaintiff's treating physicians were "the only medical sources to have opined on Plaintiff's condition after her second fusion surgery" and "the ALJ did not obtain the assistance of a medical expert to review the additional records"); Shaw v. Berryhill,

---

[9] Plaintiff also provided the opinion of her treating psychiatrist, Dr. Schaefer, noting that due to Bipolar II Disorder, Generalized Anxiety Disorder, and Panic Disorder, Plaintiff "would likely miss work substantially at least 10-15 days per month due to symptom interference. Difficulty regulating emotion, concentrating, poor sleep and low energy are most prominent." (Tr. at 772.) Plaintiff's claims in the present appeal focus on the evaluation of her physical impairments, addressed above.

Case 1:19-cv-00852-TDS-JEP   Document 17   Filed 02/19/21   Page 14 of 15

1:17CV91, 2018 WL 1322159 at *8 (M.D.N.C. Mar. 14, 2018) (remanding where "[t]he ALJ did not enlist the assistance of a medical expert to review the more recent evidence or provide an opinion regarding the extent of Plaintiff's mental impairments for the later period, and as a result, no medical professional has reviewed the records or provided an opinion for the time period covered by Dr. Millet's treating physician opinion beginning October 1, 2012."). Here, the ALJ did not obtain the assistance of a medical expert to review the new evidence in light of the significant changes in Plaintiff's condition, including spinal fusions surgery, and rejected the only medical opinion for the period after the alleged onset date. In the circumstances, and in light of the Fourth Circuit's additional guidance in <u>Arakas</u> and <u>Dowling</u>, the Court cannot conclude that substantial evidence supports the RFC assessment in the present case.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be REVERSED, and that the matter be REMANDED to the Commissioner under sentence four of 42 U.S.C. § 405(g). The Commissioner should be directed to remand the matter to the ALJ for further consideration of Plaintiff's claim in light of the above recommendation. Defendant's Motion for Judgment on the Pleadings [Doc. #14] should be DENIED, and Plaintiff's Motion to Reverse the Decision of the Commissioner [Doc. #12] should be GRANTED to the extent set out herein. However, to the extent Plaintiff seeks an immediate award of benefits, her Motion is DENIED.

This, the 19th day of February, 2021.

                                      /s/ Joi Elizabeth Peake
                                      United States Magistrate Judge